Thank you, Your Honor. My name is John Green. I am the counsel for the defendants in this case, the French Republic, its Ministry for Europe and Foreign Affairs, as well as its official tourism agency, Autopromise. Your Honors, this case is the result of the plaintiff's dissatisfaction with the result of a years-long litigation in France. Many years ago, the plaintiff brought an action in France to enforce its trademark rights in France, and the government of France, seeing this, intervened to assert its sovereign rights in its identity as the government's sovereign assertion of rights. Counsel, excuse me, can I interrupt you just a second? Of course. I thought the original action was by the defendants here against some third party that is not at issue here, right? And your government, the French government, intervened. Is that correct? The French government didn't bring this claim against him. The French government intervened in litigation that I think was brought by the plaintiff, France.com, against a third party defendant. Yes, that's right, Your Honor. So the defendant voluntarily subjected himself to the French court. Yes, that's correct. And in the French court, the issue of whether France could enforce its sovereign rights in France was brought to this court to know that this case is still going on in France. The French Supreme Court has the matter under advisement, and a decision is expected later this year. Well, how long has it been considering it? It sounds like it's been considering it a long time. Well, I don't know the exact number, but I think it has been at least a year, year and a half. Do you know when the appellate court issued its opinion? I can find it. I mean, I'm sure you've told us. Well, the appellate court decision is what began the series of events that led to this case. The government of France sent the French appellate decision to Web.com, which at the time was the registrar of the domain name at issue, pursuant to the registration agreement with the plaintiff. Web.com exercised its discretion to act after it received a court order, which awarded the website to France. That is the act that ended up resulting in France having control over the website and the plaintiff losing its control. Sir, can we say that this lawsuit was based on the French state's assertion of trademark rights? Respectfully, Your Honor, I don't think so. I think this the French decision was and French action was based on France's assertion of its sovereign identity rights. It is not it is not something that a private plaintiff could have done in the way that a private plaintiff might bring a trademark case. But that's not so key to your argument here. What's key to your argument, I think, is that this action results from the decision of the French court. Yes, yes. And that gets at the key issue that the Supreme Court teaches has to be resolved in any FSAA exemption determination. And that is what is the actual injury? What is the act that actually injured the plaintiff? What is the gravamen of the case? That is the term used in the Sachs decision. And here we say the gravamen in this case was the alleged taking, as the plaintiff puts it, of the domain name. It was the transfer. And from that flows all of the alleged injuries that the plaintiff discusses in its complaint. If you accept. Sorry, go ahead. No, I was just going to ask you. So this case seems to me to be a real intersection of comedy concerns and this immunity. Have you ever seen another one like this? I have not seen another one like this. No, Your Honor. I know the Supreme Court is considering the intersection of the FSAA and comedy right now in the Germany versus Phillips and the Hungary versus Simon cases, which are pending. Are there foreign state court decisions that provide the basis for the claims there? I'm sorry, Your Honor, I did not quite understand you. Well, maybe because I wasn't clear. It seems to me that the gist of what you're saying here is that a French court's decision provides the gravamen, if you will, the basis, the harm that is claimed by the plaintiff here. Yes. Yes, I agree. Those cases involve that same kind of setup. In other words, a foreign court's judgment. We, we, I do not recall that we found any case in the FSAA area that has that set of facts. I would say that that set of facts means this is a very ripe case for the application of international comedy. This issue, the who should own France.com, is the issue that is being litigated in France, and if you accept, as we do, that international comedy is a separate ground for a federal court here to decline to exercise jurisdiction, even if it has jurisdiction under the FSAA, we think this court, that comedy provides a separate basis for this court to dismiss this claim with prejudice. Can I ask you one other question about that, then I'll, so you told us that the French case was still proceeding, does that mean that the plaintiffs here have appealed there? That's my understanding, yes. Okay, thank you. Your Honor, I'd ask a question about whether the court decision in France was the gravamen of the action. I agreed with that proposition. And then I think there was discussion about where that action was, what was going on. Yes, yes, Your Honor. So that action is currently pending in France. It is under review by the Supreme Court of France. My client tells me that a decision is expected sometime by the summer or the fall, and that, to my knowledge, it is the plaintiff or his representatives that appealed that decision from the intermediate court in Paris to the Supreme Court. Mr. Graham, let me ask you two questions. One, shouldn't the district court have resolved a sovereign immunity issue early on? And then the second question is, how does the territory reality of a trademark law affect our decision with respect to the French court's decision on French trademark law? Those are good questions. So, turning to the second question, it is true that the plaintiff here asserts a U.S. trademark in France.com. For purposes of the sovereign immunity question, we need to look at what the gravamen of the action is, and that we submit based on the complaint and the pleadings, is the alleged taking of the domain of the French court's decision on French trademark law. And that is the domain name which resulted in France later using the domain name to direct Internet traffic to its pre-existing France tourism website at France.fr. Judge Boyd, could you repeat your first question? I'm afraid I've lost it. Should the district court have early on resolved the issue of sovereign immunity? Yes, Your Honor. We believe that it should have. We believe the cases, both in this circuit and elsewhere, teach that it's the obligation of the district court to issue a, well, a detailed analysis because the purpose of the FSIA is to protect the sovereign, not just from the consequences of litigation, but also participation in the litigation. The lower court here, well, we filed a motion to dismiss on two grounds initially, the FSIA ground as well as Rule 30b-6 on the ground the complaint did not meet the pleading standards. The judge denied the FSIA motion without discussion, but granted the Rule 30b-6 motion, and this is important because here the plaintiff has had two opportunities to plead an exception to the FSIA. It is, of course, the plaintiff's burden to do that, and we think the plaintiff has not done that. Can I go back to your answer to Judge Floyd's other question where you said, I thought that the gravamen of the complaint, I thought you, I mean, the gravamen of the suit here is something other than the French judicial action, the French judicial decision. No, that wasn't what I meant to say. What I'm saying is that the gravamen, for purposes of FSIA, is the alleged taking of this domain name and that the trademark and other claims basically flow from the later use of the property that was allegedly taken, the domain name. When you say taking of the domain name, do you mean by the French court? Is that what you mean? I mean the decision by the French court awarding the domain name to France and then France sending the decision to Web.com, the ultimate technical act which caused the transfer was something that Web.com did as it was permitted to do. Another point I'd like to make is if you accept that the gravamen is the alleged taking of the domain name and I urge the court to review the complaint and see how all the alleged harms flow from this act they say was wrongfully decided by the French court, then all the allegations with respect to what is being done on the French tourism website, whether or not that website or France receives any fees for advertising that may be on the website is all not relevant because the Supreme Court as well as the Second Circuit in Garb thought that it's important to separate out any subsequent commercial use of the allegedly taken property from the act of taking which is the gravamen of the lawsuit. I'd also like to make a point about the contacts or lack of contacts rather between the operation of the website in France and the United States. The plaintiff appears to be arguing that there is sufficient substantial contacts as the FSA requires under the commercial activity exception in order to sustain jurisdiction here and we submit that on the pleadings that is simply not true. The website France.fr is managed in France. The web domain name France.com is registered in France. That website is a passive website and that means that it would not serve to meet the minimum contact standards if this were a straightforward trademark case. Well, let me ask you this. What should have gone into the comedy analysis? Territoriality? Well, I think that's certainly the starting point on this. I think the comedy analysis should look at the importance of the issues to the foreign sovereign and whether a U.S. court is the right venue for those issues. Here, the Republic of France is asserting its sovereign rights to its identity in its own courts and I want to draw the court's attention to the BAE systems case which made the point that comedy principles are even more important where a sovereign is asserting its rights in its own courts. Turning briefly to the expropriation argument, if you accept that the taking of the domain name, the alleged taking is the gravamen, there are many reasons why this does not constitute expropriation as defined under the FSIA. First, of course, as Judge Motz has pointed out, the act that resulted in the taking is the operation of a French court. That was after years of litigation and there's no suggestion there was not due process or fair opportunity in that case. That's not a taking. There's no violation of international law here. The plaintiff makes some points, tries to argue that the result of the French court would not have been reached here in the U.S., but that is not international law. I think it actually highlights the principle that in international comedy consideration where we're looking at a long established prior litigation that's been going on for some time, the U.S. court should not take their time to decide that issue when it's already being decided, the exact same issue is being decided elsewhere. I have one more question for you. Do you think that French.com has sufficiently alleged the commercial activity exception to FSIA? We do not. We do not think they have. Why not? Because you have to start with the gravamen of the action and that the gravamen, which you use to do this analysis, is the alleged taking of the domain name. That was not commercial activity. When a court in France makes a ruling, that's not commercial. When the government sends that ruling to web.com, that's not commercial either. That's not what the Congress intended when it wrote commercial activity. And even if you think that the operation of the website in France, which allegedly receives traffic when people type in France.com in their browser bar, that website has no substantial contacts with the United States. And that is one of the four, one of the elements required in order to have commercial activity. I see my time is up. You probably reserved some time for rebuttal. We'll hear from your colleague now. Yes, Your Honors, and I'm trying to log in on my computer right now. I don't know if that is possible. I have the Fourth Circuit oral argument screen open, but if not, I'll just go with the phone. We can see you very well. Okay. Well, here it's coming up now. Thank you. Great. We can see you. Can you see us? Yes, sure can, Your Honor. There, I believe that's up. Can everybody hear me all right? I can. Yes. I think we can. Good afternoon, Your Honors. I'm Ben Barlow. I'm representing France.com, the affiliate. May it please the court. Your Honors, with all due respect, this is not a case about a French court judgment. And this is not a case about the act of sending a letter. France is sending a letter to Web.com. That's not what this case is about. The French court order that my colleague has spent their argument talking about today didn't order anyone to do anything other than my client. It ordered my client to transfer his domain name or face a fine. It didn't order Web.com to do anything. It didn't give appellants any rights to take any action. It was not a self-executing order that could just be presented in the United States with any sort of judicial review and expect that somebody grant deference or grant comity to the decision. This case is about trademark infringement. Well, but can I just ask you about this order for a minute? It was an order by a French court to which your client subjected itself to the court voluntarily. You weren't dragged in. And so there it stands. Now, if we issue an opinion in a case, there may not be any injunction issued with it. But we expect people to, particularly people that have come in and asked for our opinion on something, to honor the judgment. And we expect the general public to also honor the judgment unless they feel it. And of course, you have a perfect right to do it and it's our understanding to have it. And Judge Montz, I would agree with you in the normal situation. If this court order had been taken somewhere in France, I would expect French people to give deference to it as a statement of courts in their jurisdiction. However, we have principles of domesticating and recognizing foreign judgments in the United States. And France took every action possible to avoid any judicial scrutiny of this French court order. There was no judicial review of this court order to determine whether it offended the public policy of the United States. It's explicitly contrary to our trademark law in the United States. This was the French court litigation that the French government intervened in was litigation over a, it was a trademark litigation case, trademark infringement case that my client had filed in France. You'll see in the joint appendix that the decision of the two France and appellants to intervene in that litigation was for the specific purpose to get the domain name. This wasn't because they had an interest in the underlying trademark litigation. They had the intent and purpose of just getting this trade name because when you review their own meeting minutes, rendezvous in France was too hard for people to type into their systems. So even though they have Mr. Barlow. All right. This is dead rushing on the phone. Hi. Yes. Do you seem to be arguing now? And I think partially in your brief about that, that France didn't go through the proper procedures to domesticate this order. But do you have a cause of action for failure to properly domesticate? Aren't these arguments better lodged against web.com and whatever claim you may have against them? But your honor, as as is included in our brief, because litigation against web.com must be commenced in the middle district of Florida. There is currently there is currently activity ongoing and I'm not I'm not involved in that part of the part of the action where we're negotiating things with web.com. But this case is about the appellants infringing my client's trademark. The the order, the order didn't. So it's about I think this case is about the French court awarding your client's trademark to France. But they're not infringing it. The French court gave them the right to take it. And with all due respect, Judge Rushing, this case is the the appellants infringing on the trademark because while the order while the order said that my client had to voluntarily transfer their domain name. My client has a long standing trademark in the United States of France dot com. That's its trademark. When the appellants use the domain name France dot com to redirect Internet traffic to their own tourism promotion sites, they're infringing on my client's trademark. My client's my client's United States trademark. When they when they use a domain name that is the same as my client's long standing U.S. trademark, a trademark that is perfectly appropriate as the booking dot com decision reaffirms. When they do that, they're committing cyber squatting. We have a count for cyber squatting. Every count we have in our in our complaint does not depend on a French court decision or on a letter. That is not the gravamen of the suit. The gravamen of the suit for four of the counts is how France is currently using my client's trademark to promote their own interests. Can you point me to can you point me to the allegations in your complaint that establish a violation of international law? The violation. I'm not I'm not sure. Judge Rushing, can you can you clarify or. Well, for the expropriation exception to the takings exception, you have to have established that it's taken in violation of international law. So I I didn't I'm having trouble finding that in your that you've established a violation of international law. Your Honor, case law case law says that a taking without just compensation is in violation of international law. That when a when a taking occurs and compensation is not provided for the item took that that deprivation of property without without without compensation is in violation of international law. That's that's included in our. We went to a we went to another country court order. What this was not what this was not an important. This was not the French court ordering the transfer. France didn't act as a sovereign. France didn't act as a sovereign in attempting to get the transfer of the domain name. They acted as a private party. It's private parties that send a letter that sort of misrepresents what an order state stating that an order is enforceable and leading Webcom to believe that an order is enforceable in the United States. And it's binding upon them that that's how a private party acts. Excuse me, counsel. The French court isn't a private party. We were all in agreement on that. Right. No, Your Honor. I'm not. I'm not a private party. No, no. I'm agreeing with you, Your Honor. There's no dispute. OK, the French court isn't a private party. And France, the country. Use the decision of the French court.  And the decision of the French court is what caused you damage. Your Honor, with all due respect, I don't believe that is so that that let's say for argument's sake. And I just and I disagree that the French court decision is what effectuated the transfer here because the transfer possible. There would have been no possibility of the transfer without the decision of the French court. So that's that that is we agree on that. Right. That is indeed the tools that that appellants used to to get the transfer. I would suggest that they could just send a same sort of pressuring letter to Webcom. But for sake of argument, Your Honor, that happened. And the domain had been transferred to France. France then had to take appellants had to take the affirmative step to use that domain name improperly and infringe on the trademark. That it's it's their use of the tree. It's their use of the domain name that's infringing on my client's trademark that there's there's no cyber squatting and there's no if they take the domain name. If they get the French court, what they originally asked the French court to do is either award them the domain name or let my client keep the domain name and simply say they couldn't operate their business with that domain anymore. If they had gotten the domain name and canceled it because they didn't want to have my client competing with them in France, that wouldn't have been necessarily infringing on my client's trademark. What infringes on my client's trademark? What commits cyber squatting? What commits? What is the grounds for the reverse domain name? Hijacking is the way that they utilize the domain name in redirecting to their tourism promotion site. OK, maybe I think I understand your argument now, which, you know, we all like to understand each other. So maybe you can give me the case that you think is closest on this. I spent last night reading some Supreme Court cases and some Second Circuit cases, and I couldn't. It seemed to me triggering event. The thing that was, as you say, that caused your harm. Well, this happened, but you had to go. They didn't break it down in steps in the way that you would like to do here. So what's the best authority I can look at to see an example of what you're talking about, though? It's not binding on this court. The Second Circuit's recent decision in Pablo Starr is is close to one point. The Second Circuit in that decision didn't focus on how the Welsh government got those pictures of the Dylan Thomas photo of Dylan Thomas poems. They didn't they didn't ask whether it was an intern that had done that or whether there was a right click and paste or whether somebody took a photo in a studio of those items. They weren't concerned with how the Welsh government got those photos. What they were concerned with was what the Welsh government did with those photos, how the Welsh government infringed on the intellectual property. But of course, they didn't have the Welsh government getting the photos in the same way that the French government. Got this website, correct? Well, even if the even if that your honor, your honor, I don't want to argue with your position. That is right. There's no Welsh. There's no Welsh government decision giving anyone any rights in any photos. But the rights under United States trademark law, those those things that the book that Justice Ginsburg says in the booking.com decision are valuable property rights that are conferred when you have a trademark. Those valuable property rights in this country that have trademark protections. France doesn't get to say that that those trademark protections can be violated in the United States. A French court doesn't get to say that. If a French court believes that that is what should happen, that my client should not have its trademark rights in the United States, then the way a French court or the French government would act as a sovereign is they would get our government to recognize that position. They would get our courts to recognize that position. When you look at both Pablo Star and Pablo Stars looking at Justice Scalia's decision in Weltover and looking at Justice Souter's decision in Nelson, that you're looking at what the actual act was that gave rise to the claim. The claim is trademark infringement. The claim is cyber squatting. Those have to do. Those have to do. The claim is on federal unfair competition. Those claims have to do with how the trademark is being used, how the domain is being used and misused. It doesn't have to do with with how France managed to get the domain name in the first place. But counsel, it seemed to me I looked at this pretty carefully because we do have a bunch of claims and the Supreme Court, Second Circuit haven't gone down the claims one by one. They've said the gravamen of the complaint, you look at the source of what caused your harm. And that's that's where I'm kind of stuck here. But trademark infringement, just as the case would be in Pablo and Pablo Star. Your Honor, if I take someone's copyrighted information and I and I just keep it in my desk drawer, I haven't infringed on their copyrights. Someone might someone might be able to get me for theft of property. In this case, expropriation. Somebody might be able to get me on another claim on how I got the property. But an intellectual property infringement suit depends on how the intellectual property is used or misused. There's no there's no question that, like I said before, the Second Circuit is not looking at how those pictures of the of the poems were taken or how they were received, regardless of whether they were received by a court order or whether they were received by somebody simply snapping them on their phone in an art gallery. What the Second Circuit was concerned with was whether this whether the sovereign was doing something that if done by a private party would subject them to liability. And there's no argument here that if a private party did just what the appellants have done in this case, that they would be subjecting themselves to suit for Mr. Barlow, Judge Floyd. Same question that I ask your colleague. Shouldn't the district court have considered the sovereignty sovereign immunity claim and have given you a chance to say that we we fall within the commercial activity exception of SSI? I mean, shouldn't that what should happen here? Just judge Floyd. I think that's right. And I think that's what's happening here. Judge O'Grady or the district court early on solved our allegate and saw our allegations in our complaint. He heard oral argument. And in what this court says in base metal and Lewis, where it commits the question of whether to order discovery and the scope of discovery to the sound discretion of the trial court, Eastern District in its discretion said, I need some discovery here before I can make this decision. Well, did he did he address sovereign immunity or just look at your allegations? No, yet. Absolutely. Your honor. In his in his order, in the court's order, when it when we when we discuss these issues that are hearing a long time ago before the virus, that when we discuss those issues, the court said these issues of sovereign immunity are best resolved later in this process. Now, we understand there is no disagreement. I, I, I don't pretend that there's no authority out there saying that these questions of sovereign immunity are important and need to be raised as early in litigation as possible. But that's clearly what the court says. But early in litigation is is a broad spectrum that early in litigation doesn't mean before either party has an attempt, has an opportunity to develop a factual record. But that's not quite right either. At this stage of litigation, it would mean that we make those determinations only when the sovereign has been allowed to develop their own facts and present their own self-serving affidavits. And frankly, this court, I know that you and Judge Mott are far more familiar with the KBR cases and the Kearns case than I am. But those cases stand for the proposition that there are a number of situations where we need some amount of discovery to fully inform that decision by the trial court. The trial court shouldn't make these decisions with blinders on. So what you would want is to have it sent back and have us order the district court to provide for a limited jurisdictional discovery. I believe there should be jurisdictional discovery, just as in the Kearns case, though, in KBR. I believe that we're facing some situations here where the same facts that go towards jurisdictional immunity are closely intertwined with the facts that surround the merits of this decision. And so I believe that questions about, for instance, questions about how this taking occurred, because this taking didn't just involve Web.com doing something. If you look at the global Santa Fe case, that there's a good description on how transfers and cancellations of Internet domains occur. Well, this required France to do. But in the scheme of things, if we what I think you would like to have happen is get limited jurisdictional discovery. And upon completion of that, then the district court would have would be in a better position to rule on sovereign immunity. Absolutely, Your Honor, because the district court, we've never acted like the decision on sovereign immunity has been made. We've always taken the position that all the district court ordered below is that we have discovery so that facts can be developed so that we can address the issue of sovereign immunity. The issue of sovereign immunity doesn't have to wait until a summary judgment motion. Even though the court below said that that would be better raised at the summary judgment stage. We just believe that there should be some factual discovery. And your honors, a very important point that I raised in my brief that would go towards that limited that jurisdictional discovery. Is this issue that that Mr. Graham, my colleague, calls a novel theory, and it has to do with negative commercial activity. Because if we have jurisdictional discovery, and I ask discovery around the intents and purposes of what France did during this, we're going to get discovery objections that say that's not relevant. All we look at is the current commercial activity that someone is taking. No other court, no other circuit court has staked out a position on this. And it seems like self-evident to me, but my opinion is worth only that. A decision, decisions and actions that are taken to destroy a commercial business, or actions that are taken with the knowledge or reasonable belief that a destruction of a business will occur, are every bit as commercial as any other commercial activity that you'll take. And if this court is going to send the decision down for jurisdictional discovery, then I believe it's important to say that negative commercial activity, the act of taking negative effects on an American business, are just as commercial as any other commercial activity that you can take. Did you file a cross appeal? No, your honor. Okay. We believe the decision below should be affirmed. And I thank the court for its time. But any other questions, I'll be glad to answer. Thank you. Judge Rushing, do you have any questions? No, ma'am. Counsel? Thank you, your honor. I have five minutes just to make a couple of points. First, my colleague ended up sort of arguing his view of the merits. This appeal and this argument is about jurisdiction and whether there is an exception to the FSIA that fits. The Supreme Court teaches, and even in Pablo Starr, this is very clear, you have to figure out what the gravamen of the case is. And Sachs teaches that artful pleading does not get you around this. The plaintiff has made a lot of claims. But if you read those claims and you look at the facts, the conduct that actually injured the plaintiff is the loss of the domain name as a result of the French court decision and web.com's decision. So you don't need to get to what might happen in the future if this were to get anywhere because they haven't met their obligation to prove an exception under the FSIA. Because your contention is none of that is commercial activity. Those two things are not commercial activity. And everything having to do with the website, what France later did with the domain name that it obtained through its assertion of sovereign rights is exactly the sort of thing that Garb says doesn't change the gravamen analysis. So Judge Washington had a good question about whether there were any violations of international law. That relates to whether or not there could be expropriation here. And if this case is anything, if these facts fit into any of these exceptions, the closest is arguably expropriation. But we have many reasons why that doesn't apply. Of course, failure to allege a violation of international law is one of them. The other one I want to bring the court's attention to, and this applies on both of the exceptions, is that there is no substantial, excuse me, no substantial contacts with the US. This is a French website. While it is in English, it is directed to the whole world. There are many people outside the US that speak English. It is a passive website. You cannot buy anything from the website directly. It is not selling anything. And where it does offer goods and services, those goods and services are in France. There is no direct effect in the United States, and it certainly would not qualify for minimum contacts, which this court's decision in Girding teaches is less than what's required under the FSIA. With respect to Pablo Starr, that case is a very good example of, I think, both the Graviman analysis and also why there is no jurisdiction here. Jurisdiction was found in Pablo Starr because of the activities of the Welsh government in New York with commercial operators. The opposite is true here. My client is doing things in France on the Internet there passively. There's no allegations that France has done anything in the United States that might support jurisdiction in this case. With that, I'll rest my argument. What do you want us to do? Thank you, Your Honor. I should have concluded. We want you to dismiss this case with prejudice. It does not allege on its face, and this is why the court granted jurisdiction, is that it should decide at an early stage before discovery whether or not there is an arguable basis for jurisdiction. We think there is no pled basis for jurisdiction. You can consider the submissions, the declarations below. They were unrebutted by the plaintiff, and the law teaches they can be considered at this stage to determine whether there is an exception made. We believe this court should dismiss with prejudice. We also believe this court can dismiss with prejudice on the international comedy grounds. This case and the question of who should have France.com is going on in France and will go on there for a while. The U.S. court should not consider this and should defer to the sovereign nation of France and its determination of that issue. Thank you, counsel. We appreciate your argument. I'm sorry about the problem with the Internet, but I think we got it all together. Not your fault, Your Honor. We appreciate your argument. Usually, I don't know if you know this, but in the Fourth Circuit, we come down and shake hands. We obviously can't do that here, but we are very glad to have you with us. And I guess you're still in New York, right? Counsel? Yes, Your Honor. And you're in Virginia somewhere? Yeah, I'm in my little office in Leesburg. Thank you. We saved you a trip. Well, I was looking forward to the chance to come down to Richmond that Professor Jones over at the University of Richmond was going to take me out to lunch today. Well, we always enjoy coming down to Richmond, so we're sorry to miss you, too. Well, stay healthy. Thank you very much. Thank you, Your Honor.
judges: Diana Gribbon Motz, Henry F. Floyd, Allison J. Rushing